COMPUTER SYSTEMS OF
AMERICA, INC.,

v.

DATA GENERAL CORPORATION and
Southwestern Bell Telephone
Company.

Civ. A. No. 86–0816–MA.

United States District Court,
D. Massachusetts.

Dec. 28, 1989.

Wayne L. Stoner, Douglas G. Moxham, Hale & Dorr, Boston, Mass., for plaintiff.

David Evans, John D. Hanify, Hanify & King, Edward Woll, Jr., Sullivan & Worcester, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This matter is before me on the Report and Recommendation of the United States Magistrate as follows:

1. I RECOMMEND that Computer Systems of America, Inc.'s Motion for Partial Summary Judgment Against Defendant Southwestern Bell Telephone Company (# 99) be DENIED;

2. I RECOMMEND that Computer Systems of America, Inc.'s Motion for Partial Summary Judgment Against Defendant Data General Corporation (# 100) be DENIED;

3. I RECOMMEND that the Motion of Data General Corporation for Summary Judgment (# 93) be ALLOWED; and

4. I RECOMMEND that Defendant Southwestern Bell's Motion for Summary Judgment (# 103) be ALLOWED.

After review of the entire record, including my previous orders in the case and my court notes of numerous untranscribed status conferences, I expressly adopt the Report and Recommendation. The Magistrate has made a careful analysis of the issues presented and has provided a sound resolution of those issues supported by the facts and the law.

To the extent that the Report may indicate some conflict with my earlier order, the Report deals with issues which the Magistrate was able to address in a much more discrete fashion and on a much more developed record. The record before the Magistrate, particularly that position submitted by the defendants, allowed the Magistrate to focus on the meaning and applicability of the FCC regulations, the "heart of the controversy".

Accordingly, the Report and Recommendation is approved and adopted as an order of this Court and judgment will issue dismissing the complaint of Computer Systems of America, Inc.

SO ORDERED.

## REPORT AND RECOMMENDATION ON COMPUTER SYSTEMS OF AMERICA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT SOUTHWESTERN BELL TELEPHONE COMPANY (# 99), COMPUTER SYSTEMS OF AMERICA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT DATA GENERAL CORPORATION (# 100), MOTION OF DATA GENERAL CORPORATION FOR SUMMARY JUDGMENT (# 93) AND DEFENDANT SOUTHWESTERN BELL'S MOTION FOR SUMMARY JUDGMENT (# 103)

ROBERT B. COLLINGS, United States Magistrate.

### INTRODUCTION

Originally commenced in the Suffolk Superior Court of Massachusetts, the instant action was removed to the federal court in June of 1986. In that same month, a motion to dismiss filed by one of the defendants, Southwestern Bell Telephone Company (hereinafter "SWBT"), was denied by the District Judge to whom this case is assigned. (# 25) Thereafter, in March of 1987, Judge Mazzone likewise denied both defendants' motions for summary judgment. (# 61) On March 29, 1988, the First Circuit Court of Appeals denied the petition for permission to appeal the judge's summary judgment determination. (# 77)

In July of 1988 the plaintiff, Computer Systems of America, Inc. (hereinafter "CSA"), was granted leave to file an amended complaint. (# 81) Following the completion of discovery, CSA filed a motion seeking summary judgment on Count I of the amended complaint as against defendant Data General Corporation (hereinafter "Data General") (# 100) and a motion for summary judgment on Counts IV and V of the amended complaint as against SWBT. (# 99) Data General has filed a motion for summary judgment on all the claims asserted against it (# 93), as has the defen-

dant SWBT. (#103) These cross-motions for summary judgment have been referred to the undersigned for the issuance of a report and recommendation as to disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

## THE FACTS

The factual background of this case has been recounted at some length by the District Judge on two prior occasions. (## 22, 61) However, in order to place the plaintiff's various claims in context, the Court will indulge in one more brief summation.

In December of 1980, prior to divestiture, American Telephone & Telegraph Company entered into an agreement with Data General pursuant to the terms of which Data General was to supply electronic data processing equipment and services to the Bell Telephone Companies. As a named beneficiary of this "master agreement," SWBT submitted purchase orders in May, August and December of 1982 to Data General for the purchase and delivery of four MV/6000 computer systems. The terms and provisions of the master agreement were incorporated as part of these purchase orders. Although there appears to be a dispute as to the dates on which the equipment was actually delivered (#108, paragraph 1 at pp. 1–2), it is clear that the MV/6000 computer systems were delivered directly to SWBT by Data General.

Having determined to avoid the encumbrances involved in the ownership of the data processing systems ordered from Data General, SWBT negotiated an agreement with CSA whereby the equipment purchase orders were assigned by SWBT to CSA and CSA leased the computer systems back to SWBT. Data General consented to this arrangement, executing the assignments for each of the four MV/6000 purchase orders along with CSA and SWBT.

The purchase order assignments provided, *inter alia,* that: 1) the purchase orders were placed under the terms and conditions of the master agreement; 2) CSA was to have the same rights and remedies with respect to the purchase orders to which SWBT was entitled under the master agreement; and 3) CSA was to have the right to enforce claims under the purchase orders arising out of Data General's performance. Among the rights and remedies to which CSA became the beneficiary in SWBT's stead were the following covenants and warranties by Data General:

1. to indemnify and save (CSA) harmless from liabilities, claims or demands ... that may be made ... for injuries including ... damage to tangible property ... resulting from Data General's acts or omissions;

2. to comply with the provisions of ... all ... applicable federal, state, county and local laws, ordinances, regulations and codes in the performance of the agreement; and

3. that no equipment acquired by (CSA) ... shall require refurbishment for a period of sixty (60) months and ... in the event such refurbishment shall be required ... such refurbishment shall be performed by Data General at its sole expense.

Affidavit of Gregory H. Fox, Esq., #101, Exh. A, para. 6 and 7 and schedule C, para. 18.

Pursuant to the lease agreements for the computer systems by and between SWBT and CSA, SWBT agreed, *inter alia:*

1. that the equipment would be used in compliance with any and all rules, laws, ordinances, regulations, and other requirements of any governmental agency having jurisdiction over the equipment; and

2. to assume liability for, and ... indemnify, protect, save and keep harmless (CSA) from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs, expenses and disbursements of any kind and nature ... in any way relating to or arising out of this lease ... or in any way relating to or arising out of the manufacture, purchase, acceptance, rejection, ownership, (or) delivery to lessee ... of any item of equipment.

Affidavit of Gregory H. Fox, Esq., #101, Exh. I, sections 10 and 14.

CSA paid Data General the full purchase price for each of the data processing systems pursuant to the four purchase orders. SWBT has paid CSA all the rental payments for the MV/6000s required by the leases. What is at issue in this case is whether, as claimed by CSA, the computer equipment violated the FCC regulations set forth in 47 C.F.R. Part 15 and, if so, the extent to which the defendants are liable under the terms of the purchase orders and lease agreements to make the MV/6000s compliant.

## THE ALLEGATIONS OF THE AMENDED COMPLAINT

In Count I of its amended complaint, CSA alleges that Data General has breached the terms of the master agreement as incorporated in the purchase orders by having sold computer systems that violate the noninterference requirement of federal regulations. In Count II it is claimed that Data General negligently failed to warn the plaintiff that the data processing equipment violated federal regulations. As a consequence of its refusal to honor the warranties of compliance with federal regulations and its duty to refurbish the equipment, in Count III CSA alleges that Data General has violated Massachusetts General Laws, Chapter 93A § 11.

With respect to the second defendant, in Count IV CSA contends that SWBT has not maintained the MV/6000s in compliance with federal regulations as required, thereby breaching the terms of the lease agreements. Finally in Count V the plaintiff alleges that SWBT has determined that the computer equipment cannot be repaired so as to be compliant with federal regulations. Having made such a determination, CSA claims that under the lease agreements it is entitled to a payment of the casualty value for each of the computer systems from SWBT which the defendant has refused to pay.

## THE ISSUE

It became quite evident at the oral argument on the summary judgment motions and, indeed, was acknowledged by all coun-

sel, that resolution of the issues raised in this litigation involved questions of law turning upon the interpretation of the federal regulations contained in 47 C.F.R. Part 15. Representing as they do the heart of the controversy, the Court shall focus this report upon the meaning and applicability of these FCC regulations.

## THE OPERATIVE REGULATIONS

In general, the regulatory scheme set forth in 47 C.F.R. Part 15 applies to the use of radio frequency devices. Subpart J of Part 15 relates to computing devices such as the MV/6000s at issue in this case. In § 15.801(a), the scope of Subpart J is explained as follows:

(a) Computers and similar electronic equipment that use digital techniques generate and use radio frequency (RF) energy for timing and control purposes. Unless proper precautions are taken, some of this RF energy is radiated into space or conducted along the power line (or combination of both) and may cause harmful interference to radio communications. This subpart sets out technical and administrative specifications to reduce the interference potential of such equipment.

By virtue of § 15.801(c)(2), the MV/6000s leased from CSA to SWBT, a public utility, are exempted from complying with the technical requirements of Subpart J except that they remain subject to § 15.803.

This latter provision, § 15.803, sets forth a noninterference requirement, to wit:

Notwithstanding the compliance with the technical specifications in this part, the operation of each computing device is subject to the general conditions of § 15.3. The operator of a computing device may be required to stop operating his device upon a finding that the device is causing harmful interference and it is in the public interest to stop operation until the interference problem has been corrected.

The referenced regulation, § 15.3, is found in Subpart A of 47 C.F.R. Part 15, and provides in pertinent part general conditions of operation:

... Operation of these devices is subject to the conditions that no harmful interference is caused and that interference must be accepted that may be caused by other incidental or restricted radiation devices, industrial, scientific or medical equipment, or from any authorized radio user.

By definition, "harmful interference" as used in these regulations means:

Any emission, radiation or induction which endangers the functioning of a radio-navigation service or of other safety services or seriously degrades, obstructs or repeatedly interrupts a radio communication service operating in accordance with this chapter.

47 C.F.R. § 15.4(b).

### § 15.803 & § 15.3—ACTUAL OR POTENTIAL INTERFERENCE

To summarize, at this stage of the litigation there is no dispute that the MV/6000s are exempted devices under § 15.801(c)(2) subject only to the noninterference provisions of § 15.803 and § 15.3. The controversy arises with respect to the parties' variant interpretations of the meaning of § 15.803 and § 15.3.

The plaintiff takes the position that the noninterference provisions, § 15.803 and § 15.3, prohibit the emission of *potentionally* harmful interference by the computer equipment. The defendants, on the other hand, contend that these regulations prohibit only *actual* instances of harmful interference by computer devices. In my opinion, the defendants are correct.

In 1968 Congress enacted 47 U.S.C. § 302a, which authorized the Federal Communications Commission to

... make reasonable regulations governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications. Such regulations shall be applicable to the manu-

facture, import, sale, offer for sale, shipment, or use of such devices.

47 U.S.C. § 302a(a).[1]

According to its legislative history, the purpose of this statute was "to empower the Commission to deal with the interference problem at its root source—the sale by some manufacturers of equipment and apparatus which do not comply with the Commission's rules." 1968 *U.S.Code Cong. and Admin.News,* p. 2486.

■ In considering this legislation, Congress perceived a gap in the FCC's then existing authority. Prior to the passage of 47 U.S.C. § 302a, the Commission only had the power "to prohibit the use of equipment or apparatus which causes interference to radio communications." *Id.* at p. 2487. In other words, the FCC had no authority to try to control the interference potential of devices at the manufacturing level, but rather could only take action against a user of equipment when an actual instance of harmful interference had occurred. *Id.* at pp. 2487–2488. It was the Senate's view that it was more equitable to place the burden of equipment compliance on the manufacturer in the first instance as opposed to the user who would purchase the device assuming its operation to be legal. *Id.* at 2487–2488.

The new legislation was seen as enabling the FCC to shift its focus from "an after-the-fact approach to controlling interference." *Id.* at p. 2488. The effect of 47 U.S.C. § 302a was to empower the FCC to regulate the manufacture of equipment such that the devices would have to meet technical standards set to control their interference potential prior to sale.

■ The regulations in 47 C.F.R. Part 15, Subpart J were promulgated in 1979 pursuant to the expanded authority granted to the FCC in 1968 under 47 U.S.C. § 302a. Subpart J contains new regulations which have no comparable predecessors. A reading of these regulations reveals that they do in fact govern potential interference from computing devices in the

---

**1.** This statute was subsequently amended in 1982 adding certain provisions with respect to

home electronic equipment and systems which are not relevant to the present discussion.

sense that they set certain technical radiation and conduction levels which are not to be exceeded. *See, e.g.,* 47 C.F.R. § 15.810, § 15.812. Put another way, the regulations require that the emanations from computing devices fall within certain acceptable parameters, not that such emanations must cease altogether.

As stated earlier, the MV/6000s, having been leased to a public utility, are exempt from the requirements of Subpart J. They are only subject to the requirements of § 15.803 and § 15.3.

■ In the regulatory scheme adopted in 1979, § 15.803 is something of a catch-all provision. It provides that even if the computing devices comply with the technical specifications, if they still cause harmful interference their operation must be stopped. Having considered the language of the regulations, their context and framework as a whole, as well as the language of 47 U.S.C. § 302a and its legislative history, the Court can reach no other conclusion than that § 15.803 applies to instances of *actual* rather than *potential* harmful interference. In my view, it is the only interpretation that renders the provision meaningful.

There are several reasons that compel this conclusion. First, the FCC recognized that the RF energy generated by computing devices has the potential to or "may cause harmful interference." 47 C.F.R. § 15.801. It defies logic to believe that on the one hand the Commission would "set[ ] out technical and administrative specifications *to reduce* the interference potential" of computing devices (47 C.F.R. § 15.801) (emphasis added), and on the other prohibit all potential harmful interference. In other words, if all potential harmful interference is forbidden, what purpose is served in setting limits for radiation and conduction levels? Further, if computing devices such as the MV/6000s are exempted from complying with the technical requirements set to regulate the potential for harmful interference, would not § 15.803 be imposing a stricter, albeit vague standard for them to meet if read to prohibit any mere potential

for harmful interference as opposed to actual, concrete occurrences?

In the first instance, the purpose of the regulations is not to eliminate emanations from computing devices, all of which may potentially cause harmful interference, but to control them. It is only in the event that, despite adherence to the controlling specifications, the computing devices still cause actual harmful interference that their operation is prohibited. In the case of exempted computer devices, it follows that the noninterference provision means that the devices may be operated so long as they do not cause actual harmful interference.

Second, the language of § 15.803 itself, i.e. "is causing harmful interference", connotes an active, actual event rather than a potential one. Moreover, this section targets the user or operator of the computing device, thus harkening back to the days before the enactment of 47 U.S.C. § 302a when the FCC only had the power to regulate the use of actually interfering equipment. This interpretation is supported by the incorporation of § 15.3 in § 15.803.

As previously noted, § 15.3 is found in the general provisions of Subpart A of 47 C.F.R. Part 15, not within the new regulations in Subpart J. The pertinent language of § 15.3, i.e. "Operation of these devices is subject to the conditions that no harmful interference is caused ..." has remained consistent since the time that provision was first promulgated in 1963. These facts are significant in that § 15.3 was enacted at a time when the FCC had no authority to regulate potential interference, only actual events of harmful interference after the fact. Rather than draft a new regulation with respect to the general conditions of operation of computing devices within Subpart J under its expanded powers, the FCC chose instead to reference a pre-existing regulation which was historically limited to encompassing only actual harmful interference. There is no basis in either the regulations themselves or in the legislative history of 47 U.S.C. § 302a to find that either the meaning or scope of § 15.3 has in any manner been changed.

■ Finally, a careful reading of the language of 47 U.S.C. § 302a together with its legislative history demonstrates that the FCC was empowered to prescribe rules

... governing the interference potential of devices which in their operation are capable of emitting radio frequency energy ... in sufficient degree to cause harmful interference to radio communications.

47 U.S.C. § 302a(a).

In other words, the Commission's authority to regulate extends *only* to those devices which have the potential to cause harmful interference. Again, if the entire field of devices to be regulated has the inherent potential to cause harmful interference, it makes no sense for the FCC to set technical requirements so as to control the potential for harmful interference and simultaneously prohibit all potential harmful interference.

Where possible, the regulations must be read as a congruous whole, not as internally inconsistent. Interpreting § 15.803 and § 15.3 as applying only to instances of actual harmful interference is not only supportable, but also imparts a consistent meaning to the regulatory scheme as a whole. To the extent that Judge Mazzone's earlier opinion (# 61) can be read to have reached a contrary conclusion, I must respectfully disagree.

### THE EFFECT OF HAVING BEEN "GRANDFATHERED"

■ To this point, the discussion has addressed the effect of the regulations in Subpart J on the operation of the MV/6000s as they are exempted computer devices under 47 C.F.R. § 15.801(c)(2). In its opposition to Data General's motion for summary judgment, CSA raises an additional issue that must be resolved.

While the MV/6000s were admittedly subject to the public utility exception in Part 15 during the time period when they were operated by SWBT, upon the expiration of the lease terms the computer equipment reverted to CSA, an entity not covered by any exemptions. The plaintiff argues that at the time the leases expired, which occurred less than sixty months after the purchase and sale of the computers, and, consequently, the MV/6000s were not longer subject to the exemption in § 15.801(c)(2), Data General was obligated under the terms of the Master Agreement to make the computer equipment compliant with the technical requirements of Subpart J. The argument requires a discussion of the "grandfathering" provisions of the regulations.

The MV/6000s fall within the definition of "computing device" as set forth in 47 C.F.R. § 15.4(n). More specifically, the MV/6000's are Class A computing devices "marketed for use in a commercial, industrial or business environment." 47 C.F.R. § 15.4(*o*). The MV/6000 product line was placed into production before October 1, 1981. The particular MV/6000s which are the subject of this lawsuit were manufactured in 1982.

Title 47 C.F.R. § 15.814(a) provides:

(a) A Class A computing device first placed in production after October 1, 1981 shall be verified for compliance with the requirements for a Class A computing device prior to marketing ...

(b) All Class A computing devices manufactured after October 1, 1983 shall be verified for compliance with the requirements for Class A computing device prior to marketing ...

Because the MV/6000 product line was placed into production before October 1, 1981 and the specific MV/6000s which are the subject of this litigation were manufactured before October 1, 1983, under both subsections (a) and (b) of 47 C.F.R. § 15.814, the MV/6000s at issue in this case were "grandfathered," i.e., they did not have to be verified for compliance with the 1979 regulations for Class A computing devices prior to marketing. Therefore, in addition to being exempted devices under § 15.801(c)(2), there is no dispute that the MV/6000s at issue in this litgation are also exempted from the verification requirements of the 1979 regulations on account of having been "grandfathered" pursuant to 47 C.F.R. § 15.814(a) and (b).

Put another way, the MV/6000s were an existing product of Data General on October 1, 1981. The effect of being grandfathered is that prior to October 1, 1983, the MV/6000s which were manufactured did not have to be tested and verified as complying with the technical requirements set forth in Subpart J, § 15.810 and § 15.812. Any MV/6000s manufactured after October 1, 1983 would have to be so tested and verified even though the MV/6000s were put into production before October 1, 1981. 47 C.F.R. 15.814(b).

The regulations require that interim labelling and user information be provided with these "grandfathered" non-complying devices. As indicated, the MV/6000s at issue was manufactured in 1982. The interim labelling and user information requirements are that Class A computing devices manufactured after January 1, 1981 that have not been verified as meeting the technical requirements set forth in Subpart J are required to have a label affixed to them which reads as follows:

> This equipment has not been tested to show compliance with new FCC rules (47 C.F.R. Part 15) designed to limit interference to radio and TV reception. Operation of this equipment in a residential area is likely to cause unacceptable interference to radio communication requiring the operator to take whatever steps are necessary to correct the interference.

47 C.F.R. § 15.805(a)(1).

A comparable warning is to be included in the instruction manual for the device. 47 C.F.R. § 15.805(a)(2). The issue with respect to the grandfathered status of the MV/6000s is, once again, the meaning and effect of the relevant regulations.

The plaintiff's view is that although the MV/6000s admittedly did not have to be tested and verified for compliance as a result of 47 C.F.R. 15.814(a)(b), they nonetheless in fact had to comply with the technical requirements of Subpart J. According to CSA,

> The "grandfather" status of the equipment only exempts the MV/6000 units from the verification requirement of 47 C.F.R. § 15.814. The regulations do not exempt the equipment from the general requirement of Subpart J, in particular § 15.804.

Opposition of Computer Systems of America, Inc., Etc. (# 116) at p. 3(e).

Thus, the plaintiff argues that while grandfathered devices could be sold with the requisite labels attached, the manufacturer was selling them at its own risk, remaining liable if the devices failed to meet the technical standards.

The defendants argue that the grandfathering provisions of Subpart J effectively created a "window" period up to October of 1983 allowing the computer industry to make "an orderly development and implementation of technology, redesign of products, and modification of manufacturing and production facilities and sales procedures" prior to requiring compliance with the new technical specifications. Memorandum of Data General, Etc., # 95 at p. 9. By virtue of the labelling provisions, the regulations mandated only that the purchaser/user of the non-compliant computer device be notified or advised that the device had not been tested and verified for compliance, *ergo* the designation "non-complying", and, further, that its operation may cause interference. In short, the defendants contend that there is no requirement in the regulations that grandfathered devices meet the technical requirements of Subpart J.

The Court finds the defendants' interpretation of the regulations to be persuasive. There can be no doubt that the promulgation of the new regulations in Subpart J had a substantial impact upon the computer industry. It would seem apparent that the industry would need a period of time within which to make adjustments so as to be capable of meeting the novel technical requirements being imposed. Having provided such a window or grace period during which non-compliant labelling procedures were to be followed, it is antithetical to conclude that the FCC mandated compliance with the technical quantitative standards at the same time. Rather, properly read, the regulations struck a balance. On the one hand the manufacturer was under

an obligation to label its devices as non-compliant, not to make them compliant. On the other hand, the purchaser/user was protected to the extent of being advised that the computing device had not been tested and verified for compliance. In sum, the FCC devised a rational and equitable solution to cover a period of great adjustment within the computer industry.

In reaching these legal conclusions, as conceded by plaintiff's counsel at oral argument, the Court in effect has determined the outcome of this litigation. All of the plaintiff's claims are premised upon alleged violations of the federal regulations. In order to prove a violation of 47 C.F.R. § 15.803 and § 15.3, the plaintiff must show that the MV/6000s actually caused harmful interference. There is no evidence to support such a finding in this case. Therefore, the plaintiff's claims of breach of contract and warranty, negligent failure to warn, and unfair and deceptive acts and practices as against defendant Data General must fail. So, too, do the claims for breach of contract and for the casualty value of the MV/6000s as against SWBT.

Further, in order to prove, as alleged in Count I, that Data General was under an obligation to refurbish the MV/6000s when they reverted back to CSA at the end of the lease terms and, therefore, were no longer exempted devices, the regulations would have to mandate that grandfathered equipment comply with the technical quantitative standards set forth in Subpart J. The Court having concluded that the regulations incorporate no such requirement, plaintiff's refurbishment claim also must fail.

## RECOMMENDATIONS

For all the reasons set forth in the report, the Court makes the following recommendations:

1. I RECOMMEND that Computer Systems of America, Inc.'s Motion For Partial Summary Judgment Against Defendant Southwestern Bell Telephone Company (# 99) be DENIED;

2. I RECOMMEND that Computer Systems of America, Inc.'s Motion For Partial Summary Judgment Against Defendant Data General Corporation (# 100) be DENIED;

3. I RECOMMEND that the Motion Of Data General Corporation For Summary Judgment (# 93) be ALLOWED; and

4. I RECOMMEND that Defendant Southwestern Bell's Motion For Summary Judgment (# 103) be ALLOWED.

## REVIEW BY THE DISTRICT COURT

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to this report and these recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *United States v. Vega,* 678 F.2d 376, 378–379 (1 Cir., 1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir., 1983). *See, also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

November 30, 1989.