**COMPUTER SYSTEMS OF AMERICA, INC., Plaintiff, Appellant,**

v.

**DATA GENERAL CORPORATION, et al., Defendants, Appellees.**

**No. 90–1445.**

United States Court of Appeals, First Circuit.

Heard Dec. 21, 1990.

Decided Dec. 21, 1990.

---

Douglas G. Moxham with whom Hale and Dorr, Boston, Mass. was on brief, for plaintiff, appellant.

Edward Woll, Jr., with whom Katherine J. Ross and Sullivan & Worcester, Boston, Mass. were on brief, for defendant, appellee Data General Corp.

John D. Hanify with whom David Lee Evans, Kara L. Thornton and Hanify & King, P.C., Boston, Mass., were on brief, for defendant, appellee Southwestern Bell Telephone Co.

Before CAMPBELL, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

In this diversity case Computer Systems of America, Inc. ("CSA") has sued Data General Corp. ("DG") in the district court, alleging breach of a contract for the sale of computers. It has also sued Southwestern Bell Telephone Company ("SWBT") for breach of a contract to lease those same computers. CSA appeals from the district court's judgment and orders accepting the report of the United States magistrate (Collings, M.J.). 738 F.Supp. 27. These denied summary judgment to CSA, granted summary judgment to SWBT and DG dismissing CSA's complaint, and granted summary judgment to SWBT on its counterclaim. We affirm.

### Facts

The American Telephone and Telegraph Company, in December of 1980 entered into a "master agreement" with DG to supply computer equipment for a networking system among the Bell System Operating Telephone Companies, including SWBT. DG specifically configured the MV/6000 for use as communications processors in

the Bell system. In 1982, SWBT submitted purchase orders to DG for four MV/6000 computer systems, incorporating the terms of the master agreement as a part of the purchase orders. Preferring to lease, rather than purchase the computer systems, SWBT assigned its rights under the master agreement to CSA, which purchased the MV/6000s from DG and then leased them back to SWBT.

CSA expected to profit by leasing the MV/6000s to third parties at the expiration of SWBT's lease term in 1985. It was dismayed, therefore, to learn prior to the end of the lease that SWBT had disconnected and ceased to use three of the four computer systems. SWBT says it discontinued use of the MV/6000s because more modern equipment and software had rendered them obsolete. However, CSA contends that the computer systems also were in violation of Federal Communications Commission ("FCC") regulations concerning radio frequency emissions, rendering them unmarketable and useless to CSA after the SWBT lease had expired. 47 C.F.R. Part 15 Subpart J (1988).[1]

In this action, CSA sues DG and SWBT for the leased computers' alleged noncompliance with the terms of both the purchase and lease agreements. CSA contends that the assigned master agreement required DG to provide computer systems which complied with all FCC regulations.[2] CSA seeks damages for the economic harm caused to it by the computers' alleged noncompliance. CSA also asks the court to order the refurbishing of the computers for a five year period. CSA further contends that SWBT was obliged under the lease agreement to return only compliant computers to CSA upon expiration of the lease.[3] The noncompliant computers, it says, constituted a casualty occurrence for which SWBT is liable under the lease agreement.

1. These regulations were comprehensively revised in 1989 and "Subpart J" has been eliminated. 47 C.F.R. Part 15, 54 Fed.Reg. 17,714 (1989). The contractual issues here, however, relate to the regulatory scheme in effect prior to the 1989 revisions.

2. As successor to SWBT's rights, the following DG covenants and warranties in the master agreement applied to DG's sale of the MV/6000s to CSA:

*Master Agreement Schedule A*
6. LIABILITY
DATA GENERAL agrees to indemnify and save [CSA] harmless from any liabilities, claims or demands ... that may be made for injuries including ... damage to tangible property ... resulting from DATA GENERAL's acts or omissions.
7. COMPLIANCE WITH LAWS
DATA GENERAL agrees to comply with "all ... applicable federal, state, county and local laws, ordinances, regulations, and codes in the performance of this Agreement ... [and] to indemnify [CSA] for any loss or damage that may be sustained by reason of DATA GENERAL's failure to so comply.
*Master Agreement Schedule C*
18. REFURBISHMENT
DATA GENERAL hereby represents and warrants that no Equipment acquired by [CSA] ... shall require refurbishment for a period of sixty (60) months and ... [i]n the event such refurbishment shall be required during such period, DATA GENERAL agrees that [s]uch refurbishment shall be performed by DATA GENERAL at its sole expense.

3. CSA contends that the following SWBT covenants and warranties in the lease agreement relate to SWBT's alleged obligation to return compliant computers:

SECTION 10. Use, Maintenance and Operation; Identifying Marks
(a) [SWBT] agrees that the Equipment will be used in compliance with any and all rules, law, ordinances, regulations, and any other requirements of any governmental agency having jurisdiction over the Equipment, which are applicable to the use of the Equipment....
SECTION 5. Return of Equipment
The Equipment, when put in the possession of the carrier [at the end of the lease term], shall be in the condition in which such Equipment is required to be maintained pursuant to Section 10 hereof with all current manufacturer's engineering changes having been made, reasonable wear and tear and approved alternations and attachments excepted.
SECTION 14. Indemnification
[SWBT] agrees to ... indemnify, protect, save and keep harmless [CSA] from and against any and all ... losses [and] damages ... of any kind and nature whatsoever ... which may be incurred by [CSA] ... in any way relating to or arising out of this Lease ... or the manufacture ... acceptance, rejection, ownership ... possession, use, operation, ... maintenance [or] condition ... of any Item of Equipment....

Finally, SWBT counterclaims against CSA for storage charges for the HV/6000 computer systems. Under the lease agreement, CSA was obliged to retrieve the computers at the end of the lease term. The lease expired on December 31, 1985, CSA did not arrange for retrieval of the computers, and SWBT has placed them in storage where they remain.

Following summary judgment proceedings, the district court rejected CSA's contentions, dismissed its complaint, and found for SWBT on its counterclaim. CSA, on appeal, argues that the lower court erred, both in holding that the computer systems complied with FCC regulations and otherwise.

### The FCC Regulations

CSA's primary contention is that the DG HV/6000 computers violate the FCC's Subpart J regulations. The court below, relying on the magistrate's comprehensive report, correctly held they did not.

Electronic devices, including computers, may emit radio frequency ("RF") energy which may interfere with radio communications. Subpart J, promulgated in 1979, establishes a regulatory scheme "to reduce the interference potential of such equipment." 47 C.F.R. § 15.801(a). Prior to 1968, Congress authorized the FCC to regulate only the *operation* of electronic equipment which caused harmful radio fre-

quency interference (harmful "RFI").[4] *See* S.Rep.No. 1276, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin. News, 2486, 2487 ("The [FCC] presently has authority under Section 301 of the Communications Act to prohibit the use of equipment or apparatus which causes interference.... Under the present statute the [FCC] has no specific rulemaking authority to require that before equipment or apparatus having an interference potential is put on the market, it meet the Commission's required technical standards which are designed to assure that the electromagnetic energy emitted by these devices does not cause harmful interference to radio reception.") That regulation, embodied in 47 C.F.R. § 15.3 and now incorporated by reference into Subpart J through 47 C.F.R. § 15.803, provides that "operation of these devices is subject to the conditions that no harmful interference is caused...."

Congress amended the Communications Act of 1934 in 1968, adding 47 U.S.C. § 302a (1968) to allow the FCC to regulate the harmful RFI problem at the manufacturing level.[5] Pursuant to this new statutory authority, the FCC promulgated Subpart J in 1979. These regulations establish technical standards for RF emissions designed to control the interference potential of computing devices prior to sale, placing the burden for compliance on the manufacturer rather than the user.[6] Radiation and

---

4. The FCC defines harmful RFI as:

   Any emission, radiation or induction that endangers the functioning of a radio navigation service or of other safety services or seriously degrades, obstructs or repeatedly interrupts a radiocommunications service operating in accordance with this chapter.

   47 C.F.R. § 15.4(b).

5. Congress, in 47 U.S.C. § 302a(a) (1968), authorized the FCC to

   make reasonable regulations governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications. Such regulations shall be applicable to the manufacture, import, sale, offer for sale, shipment, or use of such devices.

   The legislative history indicates that the purpose of this section was "to empower the Commission to deal with the interference problem at

   its root source—the sale by some manufacturers of equipment and apparatus which do not comply with the Commission's rules." S.Rep. No. 1276, 1968 U.S.Code Cong. & Admin.News at 2486.

6. The scope of Subpart J is set out in the regulations as follows:

   Computers and similar electronic equipment that use digital techniques generate and use radio frequency (RF) energy for timing and control purposes. Unless proper precautions are taken, some of this RF energy is radiated into space or conducted along the power line (or combination of both) and may cause harmful interference to radio communications. This subpart sets out technical and administrative specifications to reduce the interference potential of such equipment. The devices subject to this subpart are defined in § 15.4(n).

   47 C.F.R. § 15.801(a) (1988).

conduction limits are set for commercial, industrial or business (together, "Class A") computing devices at 47 C.F.R. §§ 15.810, 15.812.

Two additional provisions of Subpart J are critical here. First, 47 C.F.R. § 15.801(c) exempts electronic devices utilized by a public utility (SWBT is a public utility, *infra*) from the requirements of Subpart J other than the § 15.803 noninterference requirement, which, as noted, incorporates the § 15.3 prohibition on actual interference. Second, pursuant to the "grandfathering" provisions of 47 C.F.R. § 15.814, Class A computing devices first placed in production prior to October 1, 1981 or manufactured prior to October 1, 1983 need not be verified for compliance with the Subpart J regulations prior to marketing. (The magistrate found that the devices in issue were all subject to these grandfathering provisions, *infra*.) Nevertheless, § 15.814(d) states that notwithstanding the grandfathering, "in the event harmful interference is caused to radio communications, subsequently produced offending units may be required to comply with the technical specifications herein...." Furthermore, § 15.805 requires that computing devices not verified for compliance (as a result of exemptions or grandfathering) must bear a label notifying users "that the equipment has not been tested for compliance and of the danger of interference to radio communications." *In the Matter of Amendment of Part 15*, 79 F.C.C.2d 67, 73–74 (1979).

CSA contends that the § 15.803 general noninterference provision prohibits the manufacture, sale, and use of all computing devices which, in operation, have the *potential* to cause harmful RFI, as well as devices which *actually* cause such harmful interference. The magistrate rejected this interpretation, and we agree with the magistrate's reasoning on this point.

Like him, we read Subpart J as having supplemented the pre-existing regulatory scheme, in place since 1963, which was limited to prohibiting actually interfering operation of computer devices. Subpart J, which adds regulations concerning the manufacture of contemporary computer devices, incorporates the § 15.3 actual interference prohibition by reference in § 15.803. There is no evidence that the historical meaning of § 15.3 to prohibit *actual* harmful RFI was changed upon incorporation into Subpart J.

CSA also contends that properly labelled exempt and grandfathered computing devices which are relieved from the obligation to verify compliance with technical emissions standards, must nevertheless comply with those same technical emissions standards. CSA interprets the exemption and grandfathering provisions only as a license to market noncompliant equipment at the manufacturer's own risk if RF emissions exceeded regulatory standards.

But we think that exempt and grandfathered equipment does, in fact, comply with FCC regulations so long as not operated so as actually to interfere. CSA's reading would prove too much. As the magistrate said:

> There can be no doubt that the promulgation of the new regulations in Subpart J had a substantial impact upon the computer industry. It would seem apparent that the industry would need a period of time within which to make adjustments so as to be capable of meeting the novel technical requirements being imposed. Having provided such a window or grace period during which non-compliant labelling procedures were to be followed, it is antithetical to conclude that the FCC mandated compliance with the technical quantitative standards at the same time. Rather, properly read, the regulations struck a balance. On the one hand the manufacturer was under an obligation to label its devices as non-compliant, not to make them compliant. On the other hand, the purchaser/user was protected to the extent of being advised that the computing device had not been tested and verified for compliance. In sum, the FCC devised a rational and equitable solution to cover a period of great adjustment within the computer industry.

As a further protection, moreover, exempt and grandfathered computing devices re-

mained subject to the § 15.803 prohibition on actual interference and the § 15.814(d) warning that, in instances of actual harmful RFI, "subsequently produced offending units may be required to comply with the technical specifications herein prior to the mandatory effective date." CSA's interpretation would render § 15.814(d) nonsensical. Clearly, the FCC opted to deal with certain exempted and grandfathered equipment on a case-by-case basis when and if actual interference problems arose. Finally, FCC statements flatly contradict CSA's interpretation:

> The interim label and user information serve several purposes. First, they provide users with information on the interference potential of various equipment. Second, they give manufacturers an incentive to bring their equipment into compliance with technical requirements as soon as possible, while allowing them ample time before compliance is mandatory.

*In the Matter of Amendment of Part 15,* 79 F.C.C.2d at 74; *see also In the Matter of Amendment of the Exemptions in Subpart J of Part 15,* 98 F.C.C.2d 1211, 1215 (1984) ("it may be more cost-effective and beneficial to the public to risk some interference from [exempt] equipment and to correct interference on an individual basis.").

### Application of the FCC Regulations to the HV/6000s

We are to review the district court's grant of summary judgment indulging all inferences and viewing the record in the light most favorable to the party opposing the motion. *E.H. Ashley & Co. v. Wells Fargo Alarm Services,* 907 F.2d 1274, 1277 (1st Cir.1990). Here, the primary issues are legal.

There is no dispute that the HV/6000 computer systems fell within the § 15.801(c)(2) public utility exemption when in SWBT's use, and also fell within the grandfathering provisions of § 15.814. Only the § 15.803 general interference prohibition applied to these computer systems. There is no evidence, moreover, as CSA conceded at oral argument, that the HV/6000 computer systems in dispute ever actually caused harmful RFI. We accordingly conclude that while the HV/6000s may not have met the technical standards set for later-modeled computers, they did not, even so, violate FCC regulations. CSA's claims based on alleged noncompliance with FCC regulations must, therefore, fail. On this basis alone, and even accepting for purposes of argument CSA's disputed construction of the contract language, we conclude that DG did not violate whatever obligations it had to provide compliant equipment nor did it violate any possible obligation to indemnify CSA for noncompliant equipment. By the same token, SWBT did not default on any obligation to return compliant equipment to CSA at the expiration of the lease term.

■ CSA makes an alternative argument—namely that SWBT's alleged determination that the equipment was incapable of being used in either its present or some modified form triggered Section 12, the casualty occurrence clause of the lease between CSA and SWBT. Even assuming, however, there was a genuine issue of material fact as to whether SWBT had discontinued use of the HV/6000s on account of its belief they were noncompliant or for some other reason, we conclude the casualty occurrence provision is simply inapplicable. Section 12 of the lease agreement, entitled "Loss or Destruction," provides:

> (a) In the event that ... [the computer equipment] shall be or become damaged beyond repair, worn out, destroyed, lost or stolen, or title thereto shall be taken by any governmental authority under power of eminent domain or otherwise or any Item of Equipment is returned to the manufacturer pursuant to its warranties or patent indemnities (any of the foregoing events hereinafter referred to as a "Casualty Occurrence"), such fact shall promptly be reported by SWBT to CSA.
>
> (b) [SWBT] shall determine, within 15 days after the date of occurrence of any such damage or wearing out, whether the Equipment can be repaired or replaced....

(c) In the event [SWBT] determines that the Equipment cannot be repaired or replaced or in the event of such destruction, loss, theft, taking of title, or return of the Equipment to the manufacturer without replacement thereof, the Equipment shall be deemed to have suffered a Casualty Occurrence....

The plain meaning of a "casualty occurrence" involves some intervening force or event. Black's Law Dictionary at 198 (5th ed.1979). The contract language, in which Casualty Occurrence is defined to include certain enumerated events, is consistent with this understanding, as is the requirement that SWBT determine within 15 days after such an event whether the computer equipment can be repaired or replaced. Neither obsolescence nor the belief that the HV/6000s were in violation of federal regulations would meet either the common or contractual definition of a casualty occurrence. We, therefore, do not reach the question of whether an issue of material fact exists regarding SWBT's alleged determination that the HV/6000s were noncompliant or otherwise nonusable.

### SWBT's Counterclaim for Storage Charges

■ SWBT has stored the computer systems since the expiration of the lease agreement, pursuant to Section 5 of the lease agreement:

[SWBT], at its sole expense, shall disconnect and dismantle the Item or Items of Equipment within ten (10) business days following the expiration or termination of the lease term.... [SWBT], at its sole expense, shall deliver the Item or Items of Equipment to a carrier specified by [CSA] ... within five (5) business days following the last day of the ten (10) day period referred to above. If [CSA] has not arranged for a carrier to pick up the Equipment and/or the Equipment has not been picked up within the five (5) day period as referred to above, [SWBT] may have the Item or Items of Equipment removed to a local warehouse in which event all storage costs shall be payable by [CSA].

SWBT asserts that upon expiration of the lease, CSA failed to arrange for retrieval of the computers, and that SWBT therefore placed them in storage. The district court further held that CSA failed to comply with District of Massachusetts Local Rule 18, which requires opponents to a summary judgment motion to file a concise statement of those material facts as to which they contend there exists a genuine issue of material fact to be tried. Because they were uncontroverted, the district court deemed the material facts asserted by SWBT to be admitted and sufficient to entitle SWBT to summary judgment on its cross-claim for storage charges. We sustain the district court.

CSA argues on appeal that it is not responsible for storage fees because SWBT failed to make reasonable efforts to mitigate damages. CSA relies upon its letter of March 8, 1985 to SWBT, urging that "Southwestern Bell either buy the equipment in question or terminate the lease under the Casualty provisions and pay to CSA" approximately $300,000. CSA contends this put SWBT on notice that CSA had no interest in the computers; SWBT should accordingly have disposed of the equipment in order to mitigate storage charges.

But we do not think this letter sufficed to authorize SWBT to dispose of the computers in order to mitigate damages. Under Section 5 of the lease, SWBT was required to turn the computers over to CSA or place them in a local warehouse, at CSA's expense, for the latter's benefit. Nothing in SWBT's letter suggested that CSA was unconditionally surrendering either its ownership rights in the computers or its rights under Section 5. To be sure, CSA asked SWBT to *buy* the equipment from it or else to enforce purported rights against the manufacturer under the casualty provisions of the contract. But SWBT was clearly unwilling to do the former, and there is no indication DG would have agreed to a casualty clause termination. In these circumstances, SWBT was scarcely in a position to sell the computers outright to a third party. Had CSA wanted to avoid the storage charges it could have

disposed of the computers itself or, pending resolution of the dispute, negotiated with SWBT to do this in some mutually acceptable manner. *S.J. Groves & Sons, Co. v. Warner Co.,* 576 F.2d 524, 530 (3d Cir.1978).

*Affirmed. Costs for appellees.*